William James RUMMEL,
Petitioner-Appellant,

v.

W. J. ESTELLE, Jr., Director, Texas
Department of Corrections,
Respondent-Appellee.

No. 76–2946.

United States Court of Appeals,
Fifth Circuit.

Dec. 20, 1978.

William James Rummel, pro se.

Scott J. Atlas (Court-appointed), Houston, Tex., for petitioner-appellant.

John L. Hill, Atty. Gen., Dunklin Sullivan, Asst. Atty. Gen., David M. Kendall, Jr., First Asst. Atty. Gen., Joe B. Dibrell, Gilbert J. Pena, Douglas M. Becker, Asst. Attys. Gen., Austin, Tex., for respondent-appellee.

Keith W. Burris, Asst. Crim. Dist. Atty., San Antonio, Tex., for Crim. Dist. Atty. of Bexar County, Tex., amicus curiae.

Michael Kuhn, Asst. Dist. Atty., Houston, Tex., for Dist. Atty. of Harris County, Tex., amicus curiae.

Harry J. Schulz, Jr., Asst. Dist. Atty., Dallas County, Tex., for Henry Wade, Crim. Dist. Atty., Dallas County, Tex., amicus curiae.

Before BROWN, Chief Judge, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN and VANCE, Circuit Judges.

THORNBERRY, Circuit Judge:

This is a habeas corpus case in which the petitioner, William Rummel, challenges his life sentence under the Texas habitual criminal statute [1] as cruel and unusual punishment in violation of the eighth amendment. A panel of this court held that his sentence violated the eighth amendment because his sentence was grossly disproportionate to his crimes. *Rummel v. Estelle*, 568 F.2d 1193 (5 Cir. 1978). The court has reheard this important case en banc and vacates the panel opinion.

## I.

*Facts*

As stated by the panel opinion, the relevant facts are:

In January 1973, a Texas grand jury indicted Rummel for the felony offense of obtaining $120.75 under false pretenses. The indictment also charged him with having two prior felony convictions: In 1964 he presented a credit card with the intent to defraud of approximately $80, and in 1969 he passed a forged instrument with a face value of $28.36.

Rummel pled not guilty to the false pretense indictment, but a jury found him guilty as charged. After the state proved his two prior convictions, Rummel received an enhanced sentence of life imprisonment under the Texas habitual criminal statute then applicable, Tex.Penal Code Ann. art. 63 (Vernon 1925).[1] On appeal, the Texas Court of Criminal Appeals affirmed his conviction. *Rummel v. State*, 509 S.W.2d 630 (Tex.Cr.App.1974). Rummel applied for postconviction relief and raised in the Texas courts the issues now before us, but his application was denied without a hearing. Then Rummel sought habeas corpus relief in the federal district court, which also denied his petition without a hearing.

568 F.2d at 1195.

## II.

As a preliminary matter, the State suggests that Rummel's petition is barred by *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and the Texas "Contemporaneous Objection Rule" because Rummel failed to object to the mandatory life sentence at the punishment stage of his trial. In *Sykes*, the Court recognized the legitimate state interest inherent in a contemporaneous objection rule. *See St. John v. Estelle*, 563 F.2d 168 (5 Cir. 1977) (en banc). Since it is apparent that the Texas Court of Criminal Appeals has repeatedly rejected Rummel-like challenges to the Texas habitual criminal statute,[2] we are at a loss to see how any state interest would be served by demanding that Rummel make a futile gesture at his trial. Moreover, Texas apparently does not re-

---

**1.** Rummel was convicted under Tex.Penal Code Ann. art. 63 (Vernon 1925). This article provides:

Whoever shall have been three times convicted of a felony less than capital shall on such third conviction be imprisoned for life in the penitentiary.

With slight rewording, this provision is carried into the new Texas Penal Code. The provision is now found at Tex.Penal Code Ann. § 12.42(d) (Vernon 1974). The statute in various forms has been the law in Texas since 1856. *See*

Tex.Laws 1856, Paschal, *Digest of Texas Laws*, art. 2464 (1866).

**2.** *Shaver v. State*, 496 S.W.2d 604 (Tex.Cr.App. 1974); *Rogers v. State*, 486 S.W.2d 786 (Tex. Cr.App.1972); *Flores v. State*, 472 S.W.2d 146 (Tex.Cr.App.1971); *Vandall v. State*, 438 S.W.2d 578 (Tex.Cr.App.1969); *Ex Parte Reyes*, 383 S.W.2d 804 (Tex.Cr.App.1964); *Mackie v. State*, 367 S.W.2d 697 (Tex.Cr.App. 1963); *Young v. State*, 170 Tex.Cr.R. 498, 341 S.W.2d 911 (1960); *Redding v. State*, 159 Tex. Cr.R. 535, 265 S.W.2d 811 (1954).

quire a contemporaneous objection when a defendant challenges the constitutionality of the statute under which he was convicted. *Gann v. Keith*, 151 Tex. 626, 253 S.W.2d 413, 417 (1952).

### III.

*The Panel Opinion*

The panel majority held that Rummel's life sentence under the Texas recidivist statute must be considered one for the entire term of Rummel's life, irrespective of any consideration of statutory good time. The majority reasoned that to consider good time credits would require the court to become involved in the parole process. 568 F.2d at 1196. Next, the court adopted the proportionality standards set out in *Hart v. Coiner*, 483 F.2d 136 (4 Cir. 1973), *cert. denied*, 415 U.S. 983, 94 S.Ct. 1577, 39 L.Ed.2d 881 (1974). *Id.* Finally, the panel

### IV.

The initial question we must answer is: Does the eighth amendment prohibit some prison sentences for minor offenses solely because of their length? The State argues that this court is without power under the eighth amendment to review any prison sentence within the legislatively created maximum. And, to be sure, there is language in some of our opinions[3] and elsewhere[4] that supports this argument.

On the other hand, Rummel argues that an excessively long prison sentence for a trivial crime can be cruel and unusual punishment. Rummel, too, is aided by language in our opinions[5] and elsewhere.[6]

held that under these standards Rummel's life sentence violated the eighth amendment. *Id.* at 1200.

**3.** *Salazar v. Estelle*, 547 F.2d 1226, 1227 (5 Cir. 1977) (semble); *Rener v. Beto*, 447 F.2d 20, 23 (5 Cir. 1971), *cert. denied*, 405 U.S. 1051, 92 S.Ct. 1521, 31 L.Ed.2d 787 (1972); *Castle v. United States*, 399 F.2d 642, 652 (5 Cir. 1968); *Ginsberg v. United States*, 96 F.2d 433, 437 (5 Cir. 1938).

**4.** *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 565, 54 L.Ed. 793 (1910) (cases cited in dissenting opinion); *Downey v. Perini*, 518 F.2d 1288, 1292 (6 Cir. 1975) (dissenting opinion), *vacated on other grounds*, 423 U.S. 993, 96 S.Ct. 419, 46 L.Ed.2d 367 (1975); *United States v. Pruitt*, 341 F.2d 700, 703 (4 Cir. 1964); *Anthony v. United States*, 331 F.2d 687, 693–94 (9 Cir. 1964); *Smith v. United States*, 273 F.2d 462, 467–68 (10 Cir. 1959), *cert. denied*, 363 U.S. 846, 80 S.Ct. 1619, 4 L.Ed.2d 1729 (1960); *Edwards v. United States*, 206 F.2d 855, 857 (10 Cir. 1953); *United States v. Rosenberg*, 195 F.2d 583, 604 (2 Cir.), *cert. denied*, 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 652 (1952); *United States v. Sorcey*, 151 F.2d 899, 902 (7 Cir. 1945), *cert. denied*, 327 U.S. 794, 66 S.Ct. 821, 90 L.Ed. 1021 (1946); *Gurera v. United States*, 40 F.2d 338, 340 (8 Cir. 1930); *Parker v. Bounds*, 329 F.Supp. 1400, 1402 (E.D.N.C. 1971); *Ormento v. United States*, 328 F.Supp. 246, 257 (S.D.N.Y.1971); Cases cited in footnote 2, *supra*.

**5.** *United States v. Bondurant*, 555 F.2d 1328, 1329 (5 Cir.), *cert. denied*, 434 U.S. 871, 98 S.Ct. 215, 54 L.Ed.2d 150 (1977); *United States v. Gamboa*, 543 F.2d 545, 548 (5 Cir. 1976); *United States v. Thevis*, 526 F.2d 989, 991 (5 Cir. 1976); *Bonner v. Henderson*, 517 F.2d 135, 136 (5 Cir. 1975); *Capuchino v. Estelle*, 506

F.2d 440, 442 (5 Cir. 1975); *United States v. Harbolt*, 455 F.2d 970 (5 Cir. 1972); *Yeager v. Estelle*, 489 F.2d 276 (5 Cir. 1973), *cert. denied*, 416 U.S. 908, 94 S.Ct. 1616, 40 L.Ed.2d 113 (1974); *United States v. Drotar*, 416 F.2d 914, 916 (5 Cir. 1969); *Rodriquez v. United States*, 394 F.2d 825 (5 Cir. 1968); *Rogers v. United States*, 304 F.2d 520, 521 (5 Cir. 1962).

**6.** *Moore v. Cowan*, 560 F.2d 1298, 1302 (6 Cir. 1977); *Roberts v. Collins*, 544 F.2d 168 (4 Cir. 1976); *Hall v. McKenzie*, 537 F.2d 1232, 1235 (4 Cir. 1976); *Downey v. Perini*, 518 F.2d 1288 (6 Cir. 1975), *vacated on other grounds*, 423 U.S. 993, 96 S.Ct. 419, 46 L.Ed.2d 367 (1975); *Hart v. Coiner*, 483 F.2d 136 (4 Cir. 1973), *cert. denied*, 415 U.S. 983, 94 S.Ct. 1577, 39 L.Ed.2d 881 (1974); *Ralph v. Warden*, 438 F.2d 786 (4 Cir. 1970), *cert. denied*, 408 U.S. 942, 92 S.Ct. 2846, 33 L.Ed.2d 766 (1972); *Black v. United States*, 269 F.2d 38, 43 (9 Cir. 1959); *Hemans v. United States*, 163 F.2d 228, 237 (6 Cir.), *cert. denied*, 332 U.S. 801, 68 S.Ct. 100, 92 L.Ed. 380 (1947); *State v. Farrow*, 386 A.2d 808 (N.H. 1978); *State v. Freeman*, 223 Kan. 362, 574 P.2d 950, 956 (1978); *State v. Mitchell*, 563 S.W.2d 18, 27 (Mo.1978) (en banc); *State v. Remmers*, 259 N.W.2d 779, 782 (Iowa 1977); *Stockton v. Leeke*, 237 S.E. 896, 897–98 (S.C. 1977); *State v. Calendine*, 233 S.E.2d 318, 330 (W.Va.1977); *State v. Lee*, 87 Wash.2d 932, 558 P.2d 236, 240 n.4 (1976) (en banc), *appeal dismissed*, 432 U.S. 901, 97 S.Ct. 2943, 53 L.Ed.2d 1074 (1977); *People v. Broadie*, 37 N.Y.2d 100, 371 N.Y.S.2d 471, 332 N.E.2d 338 (1975), *cert. denied*, 423 U.S. 950, 96 S.Ct. 372, 46 L.Ed.2d 287 (1975); *In Re Lynch*, 8 Cal.3d

As has been frequently noted, the Supreme Court has never held a punishment unconstitutional because of length alone.[7] We do know, however, that each of the nine Supreme Court Justices, at least in death cases, has embraced the proportionality concept. *Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1976) (White, Stewart, Blackmun, Stevens, JJ., plurality opinion); *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (Stewart, Powell, Stevens, JJ., plurality opinion); *Furman v. Georgia*, 408 U.S. 238, 272 n.14, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring); *id.* at 458, 92 S.Ct. at 2838 (Burger, Powell, Blackmun, Rehnquist, JJ., dissenting opinion).

■ Were this a question of history alone, we must admit that we would have great difficulty in accepting the proportionality analysis, despite the efforts to demonstrate to the contrary. *See* Granucci, "Nor Cruel and Unusual Punishment Inflicted: The Original Meaning," 57 Calif.L.Rev. 839 (1969), Comment, "The Eighth Amendment, Beccaria, and the Enlightment: An Historical Justification for the Weems v. United States Excessive Punishment Doctrine," 24 Buffalo L.Rev. 783 (1975). We conclude, however, that as a result of jurisprudential development the eighth amendment's cruel and unusual punishment provision also prohibits unreasonable punishment, and a component of unreasonable punishment can be an excessive sentence for a trivial offense. As early as *Rogers v. United States*, 304 F.2d 520, 521 (5 Cir. 1962), the court recognized that a punishment could be cruel and unusual if "it is so greatly disproportionate to the offense committed as to be completely arbitrary and shocking to the sense of justice."

■ We do not wish to retreat from this rule and therefore we conclude that the eighth amendment does proscribe some punishments that are so disproportionate as to have no rational support. As the Second Circuit has recently said in *Carmona v. Ward*, 576 F.2d 405, 409 (2 Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 874, 58 L.Ed.2d —— (1979) "[W]e accept the proposition that in some extraordinary instance a severe sentence imposed for a minor offense could, solely because of its length, be a cruel and unusual punishment."

### V.

Since we have concluded that some criminal sentences can be so disproportionate as to amount to cruel and unusual punishment, the question then becomes one of the proper standard to apply.

■ First, we hold that a punishment must be viewed as it occurs in the real world. We will consider the system as it actually works and we will not pass on academic possibilities. Second, we will at all times be mindful that it is the legislature that selects the range of punishments and it is our duty to uphold the legislature if there is any rational basis for so doing. We will remember that the petitioner challenging his sentence carries a heavy burden, *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 2926, 49 L.Ed.2d 859 (1976), and the petitioner does not discharge this burden merely by showing that he is treated more harshly than he would be treated in another state or by positing a more rational system than the one adopted by the legislature. Finally, we must remember that we can uphold a punishment as judges and disagree with that punishment as men.

Our ultimate disagreement with the panel opinion is not that it applied the *Hart v.*

---

410, 105 Cal.Rptr. 217, 503 P.2d 921 (1973); *People v. Lorentzen*, 387 Mich. 167, 194 N.W.2d 827 (1972); *Calhoun v. State*, 85 Tex. Cr.R. 496, 214 S.W. 335, 338 (1919) (semble); *McDonald v. Commonwealth*, 173 Mass. 322, 53 N.E. 874, 875 (1899); *State ex rel. Garvey v. Whitaker*, 48 La.Ann. 527, 19 So. 457 (1896) (semble); *State v. Driver*, 78 N.C. 423 (1878) (semble).

7. Rummel's reliance on *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), must be substantially discounted by the holding in *Badders v. United States*, 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706 (1916). In *Badders*, the Court, per Holmes, J., summarily dismissed a proportionality attack on a five year sentence for mail fraud.

*Coiner*[8] standards, three of which we adopt today, but from its failure to uphold a sentence if there is any rational basis for so doing.

## VI.

### A. *The Texas Habitual Criminal Law*

■ Recidivist statutes have been upheld many times against a variety of challenges.[9] The starting point of our analysis is that Article 63 is constitutional. In *Spencer v. Texas*, 385 U.S. 554, 87 S.Ct. 648, 651, 17 L.Ed.2d 606 (1967), the Court said:

. . . No claim is made here that recidivist statutes are themselves unconstitutional, nor could there be under our cases. Such statutes and other enhanced-sentence laws . . . have been enacted in all the States, and by the Federal Government as well. . . . Such statutes, though not in the precise procedural circumstances here involved, have been sustained in this Court on several occasions against contentions that they violate constitutional strictures dealing with double jeopardy, *ex post facto* laws, cruel and unusual punishment, due process, equal protection, and privileges and immunities. [Citations omitted.]

Article 63 provides:

Whoever shall have been three times convicted of a felony less than capital shall on such third conviction be imprisoned for life in the penitentiary.

■ Texas strictly construes this provision. Before one can be sentenced under the enhanced penalty provision, the State must prove that each succeeding conviction was subsequent to both the commission of and conviction for the preceding offense. *Tyra v. State*, 534 S.W.2d 695, 698 (Tex.Cr. App.1976). Moreover, the defendant must actually have gone to prison before the State can use the previous conviction for enhancement, *Cromeans v. State*, 160 Tex. Cr.R. 135, 268 S.W.2d 133, 135 (1954), and no conviction can be used for enhancement more than one time when establishing the habitual criminal status, *Carvajal v. State*, 529 S.W.2d 517, 521 (Tex.Cr.App.1975), *cert. denied*, 424 U.S. 926, 96 S.Ct. 1139, 47 L.Ed.2d 336 (1976); *Ex Parte Montgomery*, 571 S.W.2d 182, 183 (Tex.Cr.App.1978).

In practice the following events must happen before Article 63 is ever called into question:

(1) A defendant must be convicted of a felony[10] and must be sent to prison.

(2) After the defendant has been convicted of the first felony, he must be convicted of a second felony. Again, the defendant must be given a prison term.

(3) After the defendant has been convicted of the second felony and sent to prison

---

8. Recently, the Fourth Circuit has apparently seen the difficulty in applying *Hart v. Coiner* to its fullest extent. In *Davis v. Davis*, 585 F.2d 1226 (1978), *reversing Davis v. Zahradnick*, 432 F.Supp. 444 (W.D.Va.1977), the Fourth Circuit refused to overturn a forty year sentence for possessing and distributing approximately nine ounces of marijuana. The Fourth Circuit stated that the *Hart* inquiry was limited to cases in which a life sentence is imposed. *Id.* Interestingly, the Fourth Circuit relied on *Yeager v. Estelle*, 489 F.2d 276 (5 Cir. 1973), *cert. denied*, 416 U.S. 908, 94 S.Ct. 1616, 40 L.Ed.2d 113 (1974). In *Yeager*, we upheld a 500 year sentence for murder with malice. Considering Texas law, we are unable to distinguish between Yeager's 500 year sentence and Rummel's life sentence. Therefore, we will not follow the Fourth Circuit's lead and limit our inquiry to life cases. In Texas, a life sentence has essentially the same effect as one for sixty years. Certainly, the inquiry must be the same in both cases.

9. *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1961); *Gryger v. Burke*, 334 U.S. 728, 732, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948); *Graham v. West Virginia*, 224 U.S. 616, 623 (1912); *McDonald v. Massachusetts*, 180 U.S. 311, 312, 21 S.Ct. 389, 45 L.Ed. 542 (1901); *Moore v. Missouri*, 159 U.S. 673, 677, 16 S.Ct. 179, 40 L.Ed. 301 (1895); *Wilson v. Slayton*, 470 F.2d 986 (4 Cir. 1972); *Wessling v. Bennett*, 410 F.2d 205 (8 Cir. 1969); *Price v. Allgood*, 369 F.2d 376 (5 Cir. 1966), *cert. denied*, 386 U.S. 998, 87 S.Ct. 1321, 18 L.Ed.2d 349 (1967); *see generally*, Katkin, Habitual Offender Laws: A Reconsideration, 21 Buffalo L.Rev. 99 (1971).

10. This section is new, however. If the felony is a third degree felony, the trial judge has the discretion under present Texas law to reduce the offense to a first degree misdemeanor. Tex.Penal Code Ann. § 12.44 (Vernon 1974).

for the second time, the defendant must be convicted of a third felony.

Most American jurisdictions do not interpret their recidivist statutes as strictly as Texas.[11] According to Note, "Don't Steal a Turkey in Arkansas—The Second Felony Offender in New York," 45 Fordham L.Rev. 76, 78–79 (1976):

> Other states require that the defendant have been previously convicted, sentenced and "placed on probation, paroled, fined or imprisoned. . . . "[12] Florida demands a "formal adjudication of guilt," . . . .. In other jurisdictions, a verdict or a plea of guilty is all that is necessary to implement added sanctions.[13] Other opinions indicate that simultaneous, multiple convictions may be used for the purpose of applying recidivist statutes.[14] [footnotes renumbered]

## B.  Texas Good Time Credit

▮ The panel majority held that it could not consider good time credits. This holding is inconsistent with at least two other Fifth Circuit cases. *Brown v. Wainwright*, 574 F.2d 200, 201 (5 Cir. 1978) substitued opinion 576, 1148 (1978); *Rodriguez v. Estelle*, 536 F.2d 1096, 1097 (5 Cir. 1976).

The majority of the court sitting en banc has determined that *Brown* and *Rodriguez* establish the better rule for several reasons. First, *Brown* and *Rodriguez* are consistent with our view that the court is to look at the system realistically. To ignore the Texas good time system is to close our eyes to reality. Second, to assume Rummel's sentence is one for life absolutely is to import a sentence unknown to Texas law.[15]  Third,

we cannot assume, even though good time credits are not vested rights, that Texas will act arbitrarily, capriciously and unconstitutionally in administering its good time scheme. Fourth, we note that reasoned authority in other jurisdictions consider the parole probability in reviewing sentences under the eighth amendment. In *Carmona v. Ward, supra* at 413–414, the Second Circuit stated:

> We cannot agree that the recognized probability of parole in the cases before us was to be ignored when the court determined whether the statutory punishment was unconstitutional as applied to appellees. On the one hand, we are asked to look at all the circumstances which would ameliorate the seriousness of petitioners' offenses and their individual culpability in order to justify a finding that their punishment was constitutionally offensive. On the other hand, we are asked in effect to consider the appellees so incorrigible that they must be deemed destined to durance vile for the rest of their natural lives because they will never be paroled. We do not consider this to be a realistic or practical approach. See 61 Calif.L.Rev. 418, 422 (1973).
>
> We are told that the New York Parole Board is stringent, that it lacks standards and that its determinations are beyond the jurisdiction of the federal court. The suggestion that the federal court act as a New York parole board determining which prisoner should be released and under what conditions is not at all palatable as a practical matter, *Wolfish v. Levi*, 573 F.2d 118, 120 (2d Cir. 1978), to say nothing of the offense to the principles of

---

11.  Iowa's interpretation is similar to the Texas view:

> Our statute dictates that each offense must have been complete as to conviction, sentence and commitment to prison before the commission of the next in order that it qualify for application of the enlarged punishment of [Iowa's habitual offender statute].

*State v. Tillman*, 228 N.W.2d 38, 41 (Iowa 1975).

12.  *State v. Abernathy*, 515 S.W.2d 812, 814 (Mo.Ct.App.1974) (emphasis added). Accord, *Lis v. State*, 327 A.2d 746, 748 (Del.Supr.1974).

13.  E. g., *Woods v. Mills*, 503 S.W.2d 706 (Ky. Ct.App.1974).

14.  E. g., *Cox v. State*, 255 Ark. 204, 499 S.W.2d 630 (1973); *State v. Williams*, 226 La. 862, 77 So.2d 515 (1955).

15.  According to the respondent, only five states —Alabama, Arizona, Delaware, Georgia, and Tennessee—provide for a life sentence without possibility of parole.

comity and federalism. Cf. *Rizzo v. Goode*, 423 U.S. 362, 378–81, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). This court has properly reviewed cases where state prisoners have alleged denial of due process rights or other constitutional imperfections in parole procedures.[14] There is no reason to anticipate that either the petitioners here will be denied a constitutionally proper parole hearing or that the federal courts will hesitate to intervene if their constitutional rights are violated in the state proceedings. We conclude that in determining the severity of the sentences imposed here we cannot consider them equivalent to life sentences without parole.[15] Rather we must view the punishment as set forth by the statute which provides that the defendants here are eligible for parole, as are all other felons in the state, at the conclusion of their mandatory minimum sentences.

In Texas, a prisoner is eligible for parole after receiving credit for twenty years' imprisonment or after serving one third of his sentence, whichever is less. Tex.Code Crim. Pro.Ann. art. 42.12 § 15(a) (Vernon 1974). Since Rummel is serving a life sentence, he is eligible for parole after accruing credit for twenty years. Texas employs a well-developed system of awarding good time credits. Class I prisoners earn twenty days "good time" per month. Class II prisoners earn ten days "good time" per month, Tex. Civ.St.Ann. art. 61841 (Vernon 1974), and State-approved trusties earn thirty days credit for each thirty days service. Tex.Penal Code Ann. art. 61841 (Vernon 1974). Thus, a State-approved trusty can serve a life sentence in ten years.[16]

The State of Texas argues that its "good time" system is the most liberal in the country. Were we to judge this assertion, we would require more study, however, the State has provided us with a compendium of each state's good time credit system, and it appears that the Texas system compares favorably with most jurisdictions.[17] This,

we are told, is not an accident nor an example of Texas' munificence, but a part of a very definite plan. As a popular journal has stated:

> Although the prisoners are not permitted by Texas law to earn money for their work, the prison does pay them in time. State Approved Trusties (SAT)—half the inmate population—draw two-for-one good time. Every month they serve puts two months in their time accounts; a man with ten remaining years who is made an SAT serves those ten years in five calendar years. Good time earned also brings parole-eligibility dates closer. The men in the Line are in one of three grades. Lines II and III are disciplinary: Line II draws forty days for every thirty days served, and Line III draws day for day. Everyone else, even men just arriving at the Diagnostic Unit in Huntsville in custody of their county sheriffs, is Line I, which draws fifty days for every thirty served.
>
> Texas has the most liberal good-time laws in the country, which is curious since Texas also gives the longest sentences and is the most reluctant to grant parole.
>
> . . . . .
>
> The good-time grades are particularly important at Ellis, where there are so many men doing heavy time and so few who have much chance of being paroled. A change in grade from SAT to Line III doubles the years ahead to be served. Men with trusty jobs are very careful.
>
> George Beto, Estelle's predecessor as TDC director and now on the faculty in the criminal justice program at Sam Houston State University, used to tell visitors that the administration of good time and the presence of the Line kept inmates working hard in school programs and behaving properly on other jobs.

Jackson, *Hard Time*, Texas Monthly, December 1978, 138 at 258.

---

**16.** Indeed, Rummel has informed this court that he has been a State-approved trusty since March 1, 1977.

**17.** We have attached an appendix of various jurisdiction's good time provisions.

Considering Texas' good time system, the inevitable conclusion is that Rummel can be eligible for parole at the end of twelve calendar years, or considering his trusty status, even earlier.

## VII.

■ Both the panel majority and *Hart* looked to the nature of the crime in determining whether a particular legislatively selected punishment offended the eighth amendment's proportionality element. The en banc majority agrees that looking to the nature of the offense is an inexorable part of proportionality analysis.

Our disagreement with the panel majority is, however, that it failed to apply the first principle of our analysis—that every inference is to be made in favor of the selected punishment and that it erred by looking to the underlying offenses to establish the asserted triviality of the offenses. We adopt the dissent's reasoning that "Rummel was not sentenced to life imprisonment for stealing $230.00; the life sentence resulted from his having committed three separate and distinct felonies under the laws of Texas." *Rummel v. Estelle*, 568 F.2d 1193, 1201 (5 Cir. 1978) (dissenting opinion). As put another way by the Second Circuit:

> The recidivists' statutes which provide for longer sentences for repeat offenders present an example of a penalty created by the legislature because of considerations other than the specifics of the final underlying crime.

*Carmona v. Ward*, 576 F.2d at 411 n.9.

Rummel asserts that all of his offenses were "nuisance offenses"; if we were to judge this statement, we doubt that we could so blandly characterize his behavior.

Manifestly, however, Rummel has demonstrated by his past behavior that he is unable to conform himself to the rules of society. Texas has justifiably found Rummel to be a habitual criminal and has imprisoned him for this reason.

It is beyond peradventure that Texas intends to punish Rummel with at least a ten year sentence. And this does not violate the eighth amendment.[18] Beyond that, the burden is on Rummel to prove by his good behavior and diligent work that he is entitled to a place in free society.[19]

## VIII.

The panel majority argued that comparison of Rummel's sentence with the sentences imposed in other jurisdictions confirms the gross disproportionality of Rummel's sentence. 568 F.2d at 1199.

We believe that the evidence on this point is, at best, inconclusive. Of course, if the court is forced to assume that Rummel's sentence is automatically and invariably one for his natural life, then the majority's assertion is probably accurate. However, we have rejected this approach and have held that the likely probability of Rummel's jail term should be compared with the experience of other states. This Rummel has not done, and our research suggests that Rummel's actual jail time would not be significantly longer in Texas than his jail time in many other states.

The record in this case reveals that Rummel was convicted of a fourth felony on the same day he was sentenced under Texas habitual offender statute. Three states[20] punish a three time offender with a mandatory life sentence, and three states[21] provide for a discretionary life sentence for a

---

18. *See Davis v. Davis*, 585 F.2d 1226 (4 Cir. 1978); *Wood v. South Carolina*, 483 F.2d 149 (4 Cir. 1973).

19. Rummel suggests that even if he is paroled, he is still on probation and lifetime probation is in itself cruel and unusual punishment. This argument need not detain us long. We cannot understand how a lifetime requirement of good behavior is too much to ask of a habitual criminal.

20. Texas Penal Code art. 12.42(d) (Vernon 1974); Wash.Rev.Code § 9.92.090 (perhaps limited by *State v. Lee*, 87 Wash.2d 932, 558 P.2d 236, 240 n.4 (1976) (en banc); W.Va.Code § 61–11–18 (limited by *Hart*).

21. Ark.Stat.Ann. § 41–1001; Idaho Code § 19–2514; Kan.Crim.Code & Code of Crim.Proc. § 21–4504.

three time offender. Three states [22] punish a four time offender with a mandatory life sentence, and eight states [23] provide for a discretionary life sentence for a four time offender. Given these facts, it appears that up to a possible six states would sentence Rummel to a life term and up to eleven states would give discretion to the court to determine Rummel's sentence.

On the face of the record before us, we feel confident that few if any of the eleven discretionary states would sentence Rummel to the maximum discretionary life term. However, it is most important to remember that the record we have before us was developed under the particularly peculiar Texas system, and since we do not have occasion to examine the full extent of Rummel's record,[24] we cannot in complete confidence hold that no one of the discretionary states would sentence Rummel to a life sentence or a sentence that is essentially equal to the one Rummel is serving.

Finally, Rummel has made no attempt to demonstrate what the actual jail times in the various jurisdictions would amount to.[25] An example will illustrate our point. Suppose that State A gives a ten year sentence for theft and State B gives a thirty year sentence for the same theft. State A has a practice of fixed and determinate sentence and does not award early release based on good time or discretionary parole. State B, however, is similar to Texas and through long experience it can be shown that the thirty year sentence amounts to about ten years' imprisonment. Can it justifiably be said that State B punishes the theft three times more severely than State A? This court thinks not.

A variation of this very possibility might be found in our own circuit. In Georgia, upon conviction of the fourth felony, the defendant receives the mandatory maximum without parole.[26] Ga.Code Ann. § 27–2511. Rummel's equivalent offense in Georgia is theft by deception, Ga.Code Ann. § 26–1803, and the maximum penalty is ten years, Ga.Code Ann. § 26–1812. Considering the no parole provision, Rummel's imprisonment in Georgia would be approximately the same as his imprisonment in Texas.

### IX.

The panel majority held that a "[C]omparison of Rummel's sentence with the punishment accorded other crimes under Texas law" highlighted the irrational severity of Rummel's punishment. 568 F.2d at 1199. The majority compared Rummel's underlying crimes with the various Texas penalties selected for a single act. This comparison is inappropriate in this case. If this challenge were to a sentence for one act of theft, then the comparison between the sentence given for the theft and the sentence given for murder or rape would be appropriate. But this is not the case, Rummel's sentence resulted from his status as a habitual criminal.

### X.

▌ Finally, the panel majority adopted from *Hart* a test that "seeks to determine whether a *significantly* less severe punish-

---

**22.** Colo.Rev.Stat. § 16–13–101; N.M.Stat.Ann. § 40A–29–5; Wyo.Stat. § 6–1.

**23.** Alaska Stat. § 12.55.050; La.Rev.Stat.Ann. § 15–529.1; Mich.Comp.Laws § 28.1084, M.C.L.A. § 769.12; Nev.Rev.Stat. § 207.010; N.J.Stat.Ann. § 2A:85–12; N.C.Gen.Stat. § 14–7.1, 7.6; S.D.Compiled Laws Ann. § 22–7–1; Vt.Stat.Ann. tit. 13, § 11.

**24.** Nor do we have occasion to examine the discretion of the prosecutor in bringing the enhanced indictment. *But cf. Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 671–72, 54 L.Ed.2d 604 (Powell, J., dissenting).

**25.** Of course, this detailed comparison of actual practices was not required in *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 2867, 53 L.Ed.2d 982 (1977), for obvious reasons.

**26.** We cannot know definitely if the Georgia enhancement provision would apply to Rummel, but we nevertheless supply this example because there is nothing on the face of the Georgia statute that suggests to us that Georgia would not apply its enhancement statute to Rummel. We wish to underscore the difficulty of comparing the various enhancement statutes to each other.

ment could achieve the purposes for which the challenged punishment is inflicted." 568 F.2d at 1198 *citing Hart*, 483 F.2d at 141. We reject that test as a part of the appropriate proportionality analysis.

This test was taken from Justice Brennan's concurring opinion in *Furman v. Georgia*, 408 U.S. 238, 300, 92 S.Ct. 2726, 2757–2758, 33 L.Ed.2d 346 (1972). Mr. Justice Brennan's opinion stated a "lack of necessity" test or a "less drastic means" test: "Although the determination that a severe punishment is excessive may be grounded in a judgment that it is disproportionate to the crime, the more significant basis is that the punishment serves no penal purpose more effectively than a less severe punishment." [27]

This test has never commanded a majority in the Supreme Court, even in death cases. And the very circuit that has given us *Hart* declared, in *Hall v. McKenzie*, 537 F.2d 1232, 1235 (4 Cir. 1976), that death "occupies a special place in eighth amendment jurisprudence."

We believe that this passage from Wheeler, "Toward a Theory of Limited Punishment II: *The Eighth Amendment After Furman v. Georgia*," 25 Stanford L.Rev. 62, 77–78, succinctly expresses our reasons for not adopting the *Hart* "lack of necessity" test.

> The Brennan-Marshall necessity test is even more impractical in other eighth amendment adjudication, where the empirical data and long usage associated with capital punishment are absent. If a convict were to challenge the length of his prison sentence or the length of the statutory maximum as being unnecessary to deter potential criminals from committing the same crime he committed, I am convinced that the government could never show that 10 years' imprisonment deters more effectively than 5 years' imprisonment or that one year in jail deters

more effectively than a $500 fine. The problem would be even more substantial for a new punishment. If the government attempted to employ a new punishment, it would be impossible to adduce empirical data proving its necessity for deterrence purposes. Thus, if the purpose of the punishment was to increase deterrence, it would be unconstitutional because its necessity was unproved.

## XI.

Perhaps, the Texas habitual offender law and the Texas scheme that has developed under the law is not in accord with notions of modern penology,[28] but our task is not to prod the State into adopting the latest theory of penal reform. The science of penology is an imprecise one that offers us few sure answers. The Supreme Court has said this many times but the best statement is from *Gore v. United States*,

> In effect, we are asked to enter the domain of penology, and more particularly that tantalizing aspect of it, the proper apportionment of punishment. Whatever views may be entertained regarding severity of punishment, whether one believes in its efficacy or its futility, see Radzinowicz, The History of English Criminal Law: The Movement for Reform, 1750–1833, *passim*, these are peculiarly questions of legislative policy.

357 U.S. 386, 78 S.Ct. 1280, 1285, 2 L.Ed.2d 1405.

██ The legislature in our society selects the punishment scheme and we are *justified to strike down the legislature's choice only when the petitioner demonstrates that the legislative choice has no rational basis and is totally and utterly rejected in modern thought.* So long as there is room for debate, the choice of the legislature will not be overturned. *Rummel*

---

**27.** Mr. Justice White expressed a similar sentiment, 408 U.S. 238, 311, 92 S.Ct. 2726, 2763, 33 L.Ed.2d 346, and, Mr. Justice Marshall *id.* at 331, 92 S.Ct. at 2773.

**28.** *See e. g.,* Katkin, Habitual Offender Laws: A Reconsideration, 21 Buffalo L.Rev. 99 (1971); Furgeson, The Law of Recidivism in Texas, 13 McGill Law Journal 663, 665 (1967); Note, The Treatment of the Habitual Offender, 7 U. Richmond L.Rev. 525 (1973).

places great reliance on the fact that all of his crimes were nonviolent. If a state were to limit its recidivist statute to only those who have been convicted of violent crimes,[29] the state would have made a rational choice and perhaps a more rational choice than it has made in Article 63. But Rummel cannot gain any advantage by positing a more rational system than the one in existence: He must demonstrate that the system in existence is an irrational one.

■ After three felony convictions and two ineffectual prison terms, the State of Texas has chosen to place the burden on the offender to prove his entitlement to a place in society. This is not an irrational choice, and to many, one that is not particularly callous. We do not think that Texas has adopted a system that is cruel and unusual in violation of the eighth amendment, even as applied to William Rummel.

### XII.

Rummel also alleges that his trial counsel was ineffective at his state trial. The panel did not reach this issue, and we deem the issue unworthy for en banc treatment in the first instance. We therefore remand this issue to the panel for its decision on this matter.

### XIII.

We affirm the district court's denial of habeas corpus relief on the eighth amendment issue. We remand the sixth amendment issue to the panel for its original consideration.

AFFIRMED in part; REMANDED to the panel in part.

### Appendix to follow.

29. Moreover, this is to totally ignore the difficulty in determining the line between crimes that are violent or have a potential for violence or present a strong social interest. While we .have not carefully surveyed the Texas Penal Code, it appears that there are approximately forty-five third degree felonies. In combinations of three, this yields 45,190 possibilities, and sooner or later, this court could expect to see many of them.

Finally, by what authority does Rummel denegrate the interest society has in punishing his crimes? Certainly, Rummel's victims see the important social interest in deterring his behavior. Would there be a greater social interest if Rummel were to have stolen $2,300, $23,000, or $230,000 rather than the $230 he actually stole? Is it less serious to steal $230 from an elderly widow than to steal $2,300,000 from the First National Bank?

## APPENDIX

According to the State, the following are selected examples of various jurisdiction's good time provisions.

| I State | II Law First Passed | III Rate of Good Time Allowances | IV Types of Additional Good Time Allowances | V Rate of Additional Good Time Allowances | VI Offender Ineligible for Good Time | VII Effect on Parole Eligibility | VIII Effect on Discharge and/or Release |
|---|---|---|---|---|---|---|---|
| Ala. | 1843 | 6mo–1 yr 5days/mo<br>1–3 yr 6days/mo<br>3–5 yr 7days/mo<br>5–10 yr 8days/mo<br>Remaining 10days/mo | Meritorious Industrial Production<br><br>Blood Donation | 1st yr 3days/mo<br>2nd, 3rd, 4th yr 4days/mo<br>5th+ yr 5days/mo<br>30 days/yr | Life<br>Murder 1st | No effect | Credited to maximum sentence to advance discharge |
| Cal. | Repealed None 1948 | | | | | | |
| D.C. | 1901 | 1mo–1yr 5days/mo<br>1–3 yr 6days/mo<br>3–5 yr 7days/mo<br>5–10 yr 8days/mo<br>10th 10days/mo<br>Remaining 10days/mo | Blood Donation<br><br>Meritorious conduct, volunteer programs, industrial | 30 days/yr<br><br>Lump sum or<br>1st yr 3days/mo<br>2nd+ yr 5days/mo | Life | No effect | Credited to maximum sentence to advance conditional release |
| Fla. | 1871 | 1st yr 5days/mo<br>2nd yr 5days/mo<br>3rd yr 10days/mo<br>4th yr 10days/mo<br>5th yr 15days/mo<br>Remaining 15days/mo | Extra gain time<br><br>Special gain time<br><br>Special gain time | 1–6 days/mo<br><br>1–15 days/mo<br><br>1–60 days flat reduction | All eligible | No effect | Credited to maximum sentence to advance conditional release |

APPENDIX—Continued

According to the State, the following are selected examples of various jurisdiction's good time provisions.

| I State | II Law First Passed | III Rate of Good Time Allowances | IV Types of Additional Good Time Allowances | V Rate of Additional Good Time Allowances | VI Offender Ineligible for Good Time | VII Effect on Parole Eligibility | VIII Effect on Discharge and/or Release |
|---|---|---|---|---|---|---|---|
| Ga. | 1856 | 1st yr 1mo/yr<br>2nd yr 2mo/yr<br>3–10 yr 3mo/yr<br>Remaining 4mo/yr | Exemplary conduct | Set by board of corrections | Life | No effect | Credited to minimum sentence to advance conditional release |
| La. | 1842 | 25days/mo flat | None | | Life | No effect | Credited to maximum sentence to advance discharge |
| Miss. | 1892 | 1st yr 3days/mo<br>2nd yr 4days/mo<br>3rd yr 5days/mo<br>4th yr 6days/mo<br>5th yr 7days/mo<br>6th yr 8days/mo<br>7th yr 9days/mo<br>8th yr 10days/mo<br>9th yr 11days/mo<br>10th yr 15days/mo<br>Remaining 15days/mo | Extra meritorious conduct<br>Overtime or Sunday work<br>Blood Donation | Increase allowances<br>Equivalent allowances<br>10 days | All eligible | No effect | Credited to maximum sentence to advance discharge |
| N.Y. | 1817 | Rate determined by good time allowance committee not to exceed 1/3 of the maximum on an indeterminate sentence | Meritorious conduct, extra work | Rate determined by commissioner of corrections | Life | " No effect | Credited to maximum sentence to advance conditional release |

APPENDIX—Continued

According to the State, the following are selected examples of various jurisdiction's good time provisions.

| I State | II Law First Passed | III Rate of Good Time Allowances | IV Types of Additional Good Time Allowances | V Rate of Additional Good Time Allowances | VI Offender Ineligible for Good Time | VII Effect on Parole Eligibility | VIII Effect on Discharge and/or Release |
|---|---|---|---|---|---|---|---|
| Texas | 1881 | Class I 20days/mo<br>Class II 10days/mo<br>Class III None | Trusty<br><br>Blood Donation | 30 days/mo<br><br>30 days | All eligible | Credited to maximum sentence to advance parole eligibility | Credited to maximum sentence to advance discharge |
| W.Va. | 1868 | 1 yr 5days/mo<br>1–3 yrs 6days/mo<br>3–5 yrs 7days/mo<br>5–10 yrs 8days/mo<br>Remaining 10days/mo | Meritorious conduct | 9½ days/mo | Life | No effect | Credited to maximum sentence to advance discharge |
| Federal | 1867 | 6mo–1yr 5days/mo<br>1–3 yrs 6days/mo<br>3–5 yrs 7days/mo<br>5–10 yrs 8days/mo<br>Remaining 10days/mo | Camp good time, Work release good time, Community Treatment Center good time, Industrial good time, Meritorious good time, special award good time, Good time earned at other state institutions: military, state, D.C. | 1st yr 3days/mo<br>2nd and Remaining 5days/mo | All eligible | No effect | Credited to maximum sentence to advance conditional release |

CHARLES CLARK, Circuit Judge, with whom GOLDBERG, GODBOLD, JAMES C. HILL, ALVIN B. RUBIN and VANCE, Circuit Judges, join, dissenting:

In Part VIII the majority concedes that "if the court is forced to assume that Rummel's sentence is automatically and invariably one for his natural life, then the [asser-

**666**

tion that the sentence is grossly disproportionate to Rummel's crimes] is probably accurate." Nevertheless, the court decides that Rummel's life sentence is not in fact a life sentence because of Texas' good time credit system and the possibility of parole. The court reasons that it should not be concerned with "academic possibilities" but with the "real world."

But what is real and what is academic? The State of Texas has sentenced William Rummel to spend the rest of his life in the penitentiary. If parole ever comes, it comes at the sheer grace of the State. In Rummel's real world, it is not the possibility that Texas will grant him parole that governs his future. Rather, it is the existing order requiring that he be held in custody until he dies. The eighth amendment either bars affixing the sentence for Rummel's crimes or it does not. If Rummel has a constitutional right to interdict his prison term, this court must declare that right's existence without regard to the possibility that Texas, by an act of executive grace, may grant him parole.

### A.

At the outset it is important to note that the critical factor in determining how to regard Rummel's life sentence is not the Texas system for awarding good time credit but the Texas system for granting parole. The majority refers to the good time credit system and parole interchangeably, and it relies to a large extent on the relative liberality of the Texas good time credit system. The two systems embody totally different concepts, however, and they have special meanings in the context of a life sentence. Good time credit results in the early release of a prisoner under a sentence to a fixed term of years. For example, one serving a twenty-year sentence may be released after only ten years actual jail time if he has accumulated ten years of good time credit. A person committed for life, however, cannot have his prison term reduced by good time credit. Because the length of his sentence is fixed by the span of his life, there is no fixed term from which his credit can

be subtracted. No amount of accumulated good time credit entitles a man serving a life sentence to a release from prison because of credit accumulated.

The only chance for release such a life sentence prisoner has is parole. Texas law specifically provides that parole is not considered a reduction in sentence, Tex. Code Crim.Pro.Ann. art. 42.12 § 22 (Vernon Supp. 1966–1977); the sentence remains in effect during its entire period even if parole is granted. *Ex parte Lefors,* 165 Tex.Cr.R. 51, 303 S.W.2d 394 (1957). Unlike good time credit, which is an enforceable statutory entitlement subject to constitutional due process protection, *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) parole is a matter of executive grace which constitutional due process does not protect. *See* part B, *infra.*

Even under the court's own premise that it should measure probabilities rather than legally enforceable rights, however, the court's juxtaposition of Texas' good time credit system with its parole system tends both to confuse and to understate Rummel's plight. Although it is true that Texas' good time credit system may benefit Rummel by causing his eligibility for parole consideration to come earlier than may be the case in other jurisdictions, Rummel's chances for parole once he becomes eligible are by no means better than they would be in other places. According to the authority quoted in the majority opinion, "Texas . . . gives the longest sentences and is the most reluctant to grant parole." *Supra* p. 658.

Ultimately, however, the constitutional issue should not turn on how good Rummel's chances for parole consideration may be, but on the fact that they are only chances.

### B.

A convict is deemed to have been constitutionally deprived of all right to liberty for the length of his sentence, subject only to whatever legal entitlements he may have under state or federal law. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes,*

427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). The possibility of parole is not such an entitlement because it has no legal effect on the right of Texas to confine Rummel.

"Parole is an act of grace of the sovereign," *Clifford v. Beto,* 464 F.2d 1191, 1195 (5th Cir. 1972), that "cannot be demanded as a right." *Jay v. Boyd,* 351 U.S. 345, 76 S.Ct. 919, 924–25, 100 L.Ed. 1242 (1956); *Escoe v. Zerbst,* 295 U.S. 490, 55 S.Ct. 818, 819, 79 L.Ed. 1566 (1935). Historically, parole in the United States evolved from the practice of the King of England to grant conditional pardons, C. Newman, Sourcebook on Probation, Parole and Pardons 18–19 (3d ed. 1972). In Texas, parole is still classified as a conditional pardon. *Ex parte Lefors,* 165 Tex.Cr.R. 51, 303 S.W.2d 394 (1957); *Clifford v. Beto,* 464 F.2d 1191, 1194 (5th Cir. 1972).

Since parole is totally an act of grace by the state, there is no legal basis for judicial intervention in the merits of parole decisions. The Due Process clause of the Constitution only applies to property interests or liberty interests that are established "entitlements." *E. g., Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). This court has repeatedly emphasized that Texas prisoners do not have any entitlement in the nature of a liberty or property interest in their expectancy of release on parole. *Johnson v. Wells,* 566 F.2d 1016, 1018 (5th Cir. 1978); *Craft v. Texas Board of Pardons and Paroles,* 550 F.2d 1054 (5th Cir. 1977). We have frequently distinguished the mere hope of being granted parole from the limited liberty interest that accrues after parole has been granted by steadfastly refusing to extend the minimal due process protection applicable to parole revocation to the initial determination by parole boards on whether to grant parole. *Shaw v. Briscoe,* 541 F.2d 489 (5th Cir. 1976); *Cook v. Whiteside,* 505 F.2d 32 (5th Cir. 1974); *Clifford v. Beto,* 464 F.2d 1191, 1196 (5th Cir. 1972). Thus, we have refused to equate "the *possibility* of conditional freedom with the *right* to conditional freedom." *Scarpa v. United States Board of Parole,* 477 F.2d 278 (5th Cir.), *vacated for consideration of mootness,* 414 U.S. 809, 94 S.Ct. 79, 38 L.Ed.2d 44 (1973), *dismissed as moot,* 501 F.2d 992 (1973). The most thorough statement of this position is in *Brown v. Lundgren,* 528 F.2d 1050, 1052–1053 (5th Cir. 1976):

At the constitutional level, there is a clear distinction between the loss of a statutory privilege once obtained and the denial of that same privilege, never given. While the threatened loss of a privilege may be "grievous" and therefore require some degree of procedural due process protection, *see, e. g., Morrissey v. Brewer,* 1972, 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484, the denial of that privilege may only be subject to the procedural demands of the particular enabling statute. Thus, while parole revocation and prison discipline are clearly within the ambit of the Due Process Clause of the Fifth and Fourteenth Amendments, the mere expectation of parole release while still in otherwise lawful custody is not so vested as to result in a "grievous loss" if denied by the parole board. . . .

In any context where it is asserted that constitutional due process is required, the basic, threshold question is whether there is a "grievous loss" of either a liberty or property interest. If there is no such loss, then the second question of whether the particular challenged procedure comports with fundamental fairness is never reached. In short, we find that the denial of parole as distinguished from the revocation of parole as in *Morrissey,* supra, is not a "grievous loss," and we therefore do not consider whether the procedures of the parole board deny constitutional due process.

Other circuits have taken the same position as *Brown.* The Ninth Circuit has stated:

The legally convicted prisoner has no vested right to determination of his sentence at less than maximum, nor to pa-

role. . . . No rigid or even measurable criteria dictate that a particular individual must have his sentence set at less than the maximum term. These same principles apply to the granting of paroles.

*Dorado v. Kerr,* 454 F.2d 892, 897–98 (9th Cir. 1972). The Second Circuit has said that the prisoner seeking parole "neither enjoys freedom from prison walls nor is entitled to it." *Walker v. Oswald,* 449 F.2d 481, 485 (2nd Cir. 1971). In *Menechino v. Oswald,* 430 F.2d 403, 408–409 (2nd Cir. 1970), that Circuit reasoned that a prisoner seeking parole was like an alien seeking entry into the United States.

As a matter of law, Rummel's sentence deprives him of all right to liberty for the rest of his life.[1] To treat Rummel's sentence as one to serve less than life is, analytically, no different from treating a death sentence as imposing a milder punishment because of the possibility of an executive pardon. *Carmona v. Ward,* 576 F.2d 405, 420 (2nd Cir. 1978) (Oakes, J., dissenting). Rummel's future chance for parole has no legal significance, it is merely a statistical possibility of clemency, an unenforceable hope that he may someday benefit from the grace of a parole board.[2] The eighth amendment demands that Rummel's claim be judged by the law of rights and duties, not the law of probabilities.

### C.

Not only is Rummel's sentence not legally ameliorated by the possibility of parole, but his actual chances of being paroled have little to do with the crime for which he was sentenced. They largely depend on his *subsequent* behavior in prison. If he ever does gain parole, his *subsequent* behavior outside of prison, even if non-criminal, may result in revocation and return to prison forever. Tex.Code Crim.Pro.Ann. art. 42.12 § 22. (Vernon Supp.1978).

Texas repeatedly emphasizes that Rummel has a good chance of parole eligibility in 10 to 12 years, implying by its protestations that 10 to 12 years would adequately serve the state's penological interests. The majority's intimation that Rummel's case is an attractive one for relatively early parole also suggests that insofar as Rummel's punishment is considered in connection with his crimes alone, a life sentence would be disproportionate. Indeed, the court concedes that if it considered his sentence one for life, it would be grossly disproportionate. It relies on Rummel's chances for something less. The state's equation then, is that if Rummel's three crimes do not in themselves justify life imprisonment, three crimes plus subsequent bad behavior in prison would.

It is almost certain to the state that if Rummel does serve the rest of his natural life in jail, it will not be for the crimes for

1. The cases cited on this issue in our own circuit as well as the Ninth and Second Circuits clearly rely on the classic right-privilege distinction, a distinction that has drawn scholarly and judicial attack. *See, e.g., Morrissey v. Brewer,* 408 U.S. 471, 482, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484 (1972); *Goldberg v. Kelly,* 397 U.S. 254, 262 and n.8, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970); Van Alstyne, *The Demise of the Right-Privilege Distinction in Constitutional Law,* 81 Harv.L.Rev. 1439 (1968). However, the Supreme Court's more recent pronouncements in the due process area, *Roth, Sindermann,* and *Bishop, supra,* clearly require the existence of a legal entitlement to a property or liberty interest before the due process clause applies. The entitlement doctrine is in fact the right-privilege distinction resurrected in new verbal garb. *See generally* Note, *Democratic. Due Process: Administrative Procedure After Bishop v. Wood,* 1977 Duke L.J. 453.

Whatever the hope of release on parole may be labeled, under the cases cited in the text, it definitely does not rise to the level of a "right" or an "entitlement" and it definitely confers no legally protectable interest on the prisoner.

2. The California Supreme Court in *In re Lynch,* 8 Cal.3d 410, 419, 105 Cal.Rptr. 217, 223, 503 P.2d 921, 926, (1972), held that a life sentence with parole had to be treated as a life sentence for the purposes of eighth amendment analysis. One of the factors relied on by the court was the fact that the penalogical function of parole is only to mitigate a punishment which would otherwise be deserving. 105 Cal.Rptr. at 217, 503 P.2d at 921. The holding in *Lynch* was followed by New York in *People v. Broadie,* 37 N.Y.2d 100, 110, 371 N.Y.S.2d 471, 474, 332 N.E.2d 338, 341 (1975).

which his sentence was imposed, but rather for other reasons. These reasons the world may never know. No public record need show which of an infinite number of reasons caused Rummel to fall into disfavor with the parole board. He may by laziness or insolence make enemies of prison authorities. His personality may cause trouble with other prisoners. Many forms of behavior which bring discipline in prison are not criminal in the outside world. Rummel has no recourse if the parole board in its virtually unfettered discretion is never moved to release him or tell him why it did not.[3]

Parole, if it does come, is in no way equivalent to the freedom of an ordinary citizen. The conditions imposed on the parolee are wide-ranging, and any violation may result in a return to prison. The Supreme Court described typical parole restrictions in *Morrissey v. Brewer, supra,* 92 S.Ct. at 2598–99:

> Typically, parolees are forbidden to use liquor or to have associations or correspondence with certain categories of undesirable persons. Typically, also they must seek permission from their parole officers before engaging in specified activities, such as changing employment or living quarters, marrying, acquiring or operating a motor vehicle, traveling outside the community, and incurring substantial indebtedness. Additionally, parolees must regularly report to the parole officer to whom they are assigned and sometimes they must make periodic written reports of their activities.

There is no way for this court to predict whether, in the event that he is paroled, Rummel will run afoul of some parole restrictions which again would not constitute criminal behavior. In *Morrissey* the Court stated that it is estimated that 35–45 percent of all parolees are returned to prison

for parole violations. 92 S.Ct. at 2599, *citing* President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections 62 (1967). Rummel will have to toe any line the parole board may draw during his time in prison to have any chance at parole, and he will have to continue to toe its line for the rest of his life to maintain any limited freedom he may gain as a parolee. Rummel has no right to pay a constitutional penalty for his crimes and be done with them. *See Weems v. United States,* 217 U.S. 349, 366–67, 30 S.Ct. 544, 54 L.Ed. 793 (1909).

A person who receives a twelve-year sentence for a crime in Texas and is totally recalcitrant in his behavior while in prison can do no worse than serve his whole twelve years. The parole board may choose not to let him out early, but it cannot make him stay longer than the term of his sentence. What that person may do after his term is served, so long as it is not criminal, is his own business. If Rummel's offenses, standing alone, only justify a maximum sentence to a term of years, then he should be able to serve those years and be done with them, no matter what the parole board thinks of him. But that is not Rummel's condition. Texas has deprived Rummel of any legally enforceable right to his freedom for his entire life and the chances for grace are perilous and without protection of law.

The Constitution says that his sentence should not stand if lifetime deprivation of freedom is grossly disproportionate to his crimes.

#### D.

Although the Supreme Court has never dealt with the proper construction of a sentence with a chance of parole for the purposes of the eighth amendment, the Court has treated the problem in reviewing sentences under the *ex post facto* clause. U. S.

---

**3.** The substantive standard applied by the board is "the best interest of society," Tex. Code Crim.Pr.Ann. art. 42.12 § 22. The situation is not novel. In 1637, the annals of the General Court of the Massachusetts Bay Colony record the following dialogue in the Banishment of Anne Hutchinson:

> "Ms. Hutchinson: I desire to know wherefore I am banished.
> "Gov. Winthrup: Say no more. The court knows wherefore and it is satisfied."

Const. art. I, § 10. In *Lindsey v. State of Washington,* 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937), the Court reviewed a conviction from the State of Washington. At the time the petitioner, Lindsey, had committed his crime of larceny, the law provided for the sentence to be fixed by the trial judge at a minimum of 6 months and a maximum of 15 years. Parole was authorized in the discretion of the parole board at any point prior to the expiration of the sentence received. At the time Lindsey was sentenced, however, the law had been changed to a scheme similar to the present Texas system. A mandatory 15-year sentence was provided. At the same time, however, the statute provided that "a convicted person may be released on parole by the board after he has served the period of confinement fixed by the board, less time credits for good behavior and diligence." 301 U.S. at 399, 57 S.Ct. at 798. The Supreme Court held that in determining the constitutionality of the sentence the contingent possibility of parole was irrelevant; the constitutionality of the sentence had to be measured by the mandatory statutory maximum of 15 years:

> The effect of the new statute is to make mandatory what was before only the maximum sentence. Under it the prisoners may be held to confinement during the entire fifteen-year period. Even if they are admitted to parole, to which they become eligible after the expiration of the terms fixed by the board, they remain subject to its surveillance and the parole may, until the expiration of the fifteen years, be revoked at the discretion of the board or canceled at the will of the governor. It is true that petitioners might have been sentenced to fifteen years under the old statute. But the *ex post facto* clause looks to the standard of punishment prescribed by a statute, rather than to the sentence actually imposed.

301 U.S. at 400–401, 57 S.Ct. at 798–99. The Supreme Court went on to acknowledge the difference between a release from prison after a number of years at the end of a sentence and release from prison after the same number of years on parole:

> Removal of the possibility of a sentence of less than fifteen years, at the end of which petitioners would be freed from confinement and tutelage of a parole revocable at will, operates to their detriment in the sense that the standard of punishment adopted by the new statute is more onerous than that of the old. . . . It is plainly to the substantial disadvantage of petitioners to be deprived of all opportunity to receive a sentence which would give them freedom from custody and control prior to the expiration of the fifteen-year term.

*Id.* at 401, 57 S.Ct. at 799. The continued vitality of the *Lindsey* holding was confirmed in the Supreme Court's recent opinion in *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), in which the Court said with reference to *Lindsey*:

> Even though under the new statute a convict could be admitted to parole at a time far short of the expiration of his mandatory sentence, the Court observed that even on parole he would remain "subject to the surveillance" of the parole board and that his parole itself was subject to revocation.

97 S.Ct. at 2301. Although *Lindsey* and *Dobbert* were decided under the *ex post facto* clause and not the eighth amendment, their reasoning is fully applicable to Rummel's case.

### E.

When the petitioner's punishment is correctly characterized as a life sentence, its excessiveness is striking even with the greatest deference to the state's legitimate interests in punishing recidivism. My views on the unconstitutional disproportionality of the sentence were set forth in the original panel opinion:

> The legislative objective of punishing recidivists certainly is legitimate. However, in view of the dramatically lower minimum penalties that Texas imposes upon defendants who commit even the most violent crimes short of capital murder and even upon defendants with a

second conviction and a prior offense involving violent second-degree felonies, it clearly appears that a significantly less severe penalty would fulfill the legislative objectives of protecting citizens and deterring crime. The recent reclassification of Rummel's third offense as a misdemeanor under Texas law buttresses this view. That at most two other states and perhaps none would require life imprisonment for a defendant in Rummel's circumstances confirms the constitutional disproportionality of the sentence given Rummel.

*Rummel v. Estelle*, 568 F.2d 1193, 1200 (5th Cir. 1978).

The sentence which Texas imposed is society's judgment and, if upheld, society has every legal right to enforce it. If Texas chooses to make good the threat which the sentence itself imposes, no court may be a refuge for Rummel. We may speculate as to Rummel's likely fate, but these guesses are without constitutional significance. "The threat makes the punishment obnoxious." *Trop v. Dulles* 356 U.S. 86, 102, 78 S.Ct. 590, 599, 2 L.Ed.2d 630, 643 (1957).

It is true that Rummel's severe sentence arises not merely from the inherent nature of his crimes but from the fact that his felonies were three in number. It is equally true that Texas may treat recidivists more harshly than other offenders and that the Texas statute on its face is constitutional. *Spencer v. Texas*, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967). But Rummel is not Spencer. Nor is the constitutionality of Texas' imposition of life imprisonment on Spencer a determination that life imprisonment can constitutionally be imposed on Rummel. Recidivism is no talisman that justifies life imprisonment for any three felonies without regard to their underlying seriousness.

William Rummel is now sentenced to life imprisonment because, in addition to a 1973 conviction for obtaining $120.75 by false pretenses, he had previously been convicted in 1969 for passing a forged check for $28.36 and in 1964 for credit card fraud involving $80.00. Even when enhanced by the fact that Rummel repeated his petty cheating conduct three times over a period of nine years, the action of the State of Texas in ordering him imprisoned until he dies is so shockingly disproportionate to his offenses that I am obliged to respectfully dissent.